## Fleming's Appeal.

1. Rankin in 1785 granted to Allison, his heirs and assigns for ever, the partial use of a stream running between them. The borough of Greencastle was afterwards laid out by Allison on his land, and he sold lots; the grantees of Allison were entitled to the grant of the water.

2. The stream crossing streets and alleys, the borough is to be considered a grantee of Allison entitled to the benefit of the grant of water.

3. This being an artificial stream of water, each proprietor of land over which it passes, including the borough in respect to the streets, &c., has a right to the enjoyment of it, in the course marked out for it.

4. Every such proprietor is bound to keep his portion of the stream in such condition of repair that the usual amount shall be transmitted to those below in its usual state of purity.

5. If he fails he is liable to an action by the proprietors below, including the borough.

6. An Act of Assembly of April 28th 1857, authorized the borough "to take upon themselves the supervision" of the watercourse, see that the proper quantity was at all times delivered, &c., to enter upon the streets, lots, &c., to remove obstructions, repair, &c., the expenses as related to the streets to be paid out of the borough funds, those on the lots to be assessed on them according to the amount expended on each and be collected as taxes are; and to pass ordinances providing penalties upon persons doing wilful injury to or obstructing the watercourse, &c. *Held*, that so far as the act intended to vest in the borough the right to recover all the damages suffered by Allison's other grantees, it was unconstitutional.

May 11th 1870.   Before Thompson, C. J., Read, Agnew and Sharswood, JJ.

Appeal from the decree of the Court of Common Pleas of *Franklin county:* In equity: No. 101, to May Term 1870.

A bill was filed on the 7th of August 1869, by C. W. Rhodes and others against Jacob R. Fleming, burgess, B. F. Winger and others, town council, and Daniel Hanbecker, constable of the borough of Greencastle. The plaintiffs were residents of Greencastle.

The facts in the case were, that one John Allison was the proprietor and founder of Greencastle, and that on March 8th 1785 one William Rankin delivered his bond to Allison in the penalty of 500*l.*, with condition that Rankin would allow and grant unto Allison "his heirs, executors, administrators or assigns * * * such quantity or proportion of his stream of water, at the line between said Rankin and Allison, where the watercourse now is of the breadth of two feet, and such a sufficient quantity as will run through one two-inch augur bore, with two inches and a-half head above the upper part of said bore, this quantity of water to be allowed to run from the 1st of March until the 1st of September, yearly and every year for ever, and then from the 1st day of September until the 1st day of March yearly and every year as much as will run through one four-inch augur bore, with the aforesaid quantity of head." In pursuance of this obligation the stream was allowed to flow through the streets of Greencastle

and over the lots of the plaintiffs and others in Greencastle. The complainants were assignees of Allison of lots along the water-course.

On the 28th of April 1857 a supplement (Pamph. L. 329) to the Act incorporating Greencastle was passed, providing:—

Sect. 1. "That the burgess and town council of the borough of Greencastle be authorized and empowered to take upon themselves the supervision of the water and watercourse in the borough aforesaid, to see that the proper quantity of water is at all times delivered by the heirs or assigns of William Rankin, deceased, and to enforce the delivery of the same by such suit or suits in their corporate name as may be necessary, and whenever they shall deem the same necessary, may by themselves, their agents, engineers, &c., and with their tools, carts, &c., enter upon any of the lands, lots and enclosures, streets, lanes, alleys and high-ways along the original or present course of the said stream for the purpose of examining the condition thereof, removing obstruc-tions therefrom, repairing the bed or channel of the same or pre-venting the wasting of the water therefrom or its appropriation to uses not designed originally."

Sect. 2. "The expenses incurred in repairing the said water-course and keeping the same in good order shall be paid as follows, to wit: those incurred in the streets, lanes and alleys of the said borough shall be paid out of the borough funds, and those incurred on private property shall be taxed by the said borough and town council against the property through which the said stream passes, according to the amount expended upon each property, and shall be a lien thereon and collected as other borough taxes are by law collected."

Sect. 3. "The burgess, &c., may by ordinance provide what fines and penalties shall be enforced against any person who shall wilfully or maliciously do any damage to said water-course, or who shall obstruct, or divert, or use the water unlawfully, waste it or render it unfit for use."

The borough authorities entered on the lots of the plaintiffs without their consent, made repairs, &c., and issued their warrant to collect the costs and expenses incurred upon their lots.

The bill set out these facts, and further set out, that the stream was for the common benefit of all the residents of Greencastle, is used by all in common, that the plaintiffs had "no special or greater interest in the water of said stream than is common to all the said citizens and residents of said borough, and your orators use said water in no other or different manner than it is used by said other citizens and residents;" that until recently the stream had been kept clear of obstructions, &c., at the expense of the borough, and the expenses were paid from the general taxation.

The prayers were:

[Fleming's Appeal.]

1. For an injunction to restrain the defendants from collecting the expenses above mentioned.

2. That the court would decree assessments for that purpose to be void.

3. That the Act of 1857 might be declared unconstitutional.

4. General relief.

The court awarded a preliminary injunction.

The defendants filed an answer, admitting that the water was for the common benefit of all the residents of Greencastle, but denying that the plaintiffs had no special nor greater interest in the water beyond other residents; they denied that the stream theretofore had been kept free from obstructions at the expense of the borough, and aver that it had been done at the expense of the lot-holders along the course of the stream.

The matter was referred to Theodore McGowan, Esq., as examiner, who reported the facts as above stated. He also reported that there were two public cisterns in the streets of Greencastle, on the line of the stream, placed there by the borough authorities. The stream, with some alterations made at the request of the lot-holders, passes through the borough from north to south, as when Rankin's obligation was executed, passing over streets and alleys, lots and enclosures; it ran for many years over the ground, but in 1857 was trunked for the first time, and dipping-boxes placed in the streets for the convenience of the residents and their cattle; the expenses of this work were paid by the borough for the portion in the streets, &c., and by the lot-holders for the portion within the limits of their lots. In 1867 the repairs which gave rise to this complaint were made. He reported also that water was " used by all, whether lot-holders or not, for the purposes of washing, scrubbing, watering stock and for building purposes by those near enough to the stream. The water is unfit for drinking or cooking, and is not used by any for those purposes, save perhaps the first lot-holders on the northern side, where the stream enters the town.* * * The uses by the public not lot-holders near the stream are the watering of stock, hauling away for building purposes, &c., and in case of fires."

He also found :—

1. " That the plaintiffs the lot-holders have no special or greater interest, as a class, in the water of the stream than is common to all the citizens or residents of Greencastle.

2. " It does not appear at all how the expenses, if any, incurred prior to 1857, were met, nor that any, in fact, were incurred."

The defendants excepted to the report of the examiner, that he had " found as a fact that the owners of the lots through which the stream of water passes have no special or greater interest in said stream of water than the citizens of said borough generally."

After the hearing the court decreed : "that the said Act of

Assembly passed the 28th day of April, A. D., 1857 is unconstitutional and void so far as the same provides for the taxing of the lots through which said stream passes, for the improvement and repair of said stream; and therefore the assessment of taxes under and by order thereof upon the properties of the complainants is illegal and invalid. The preliminary injunction is hereby decreed perpetual."

The defendants appealed to the Supreme Court, and assigned for error:

1. Overruling the exceptions to the examiner's report.

2. Deciding the assessment of taxes for the repairing of said stream of water to be illegal and invalid.

3. Deciding that "the Act of Assembly, passed on the 28th day of April 1857, is unconstitutional and void, so far as the same provides for the taxing of the lots through which said stream passes."

*W. U. Brewer* and *Kennedy & Stewart*, for appellants, cited Hammett *v.* Philadelphia, antea, p. 146.

*J. McD. Sharpe* and *F. M. Kimmell*, for appellees, also cited Hammett *v.* Philadelphia.

The opinion of the Court was delivered, July 7th 1870, by

SHARSWOOD, J.—The appellants complain that the court below overruled their exception to the report of the examiner (who was invested by his appointment also with the functions of a master), which was that he had found as a fact "that the owners of the lots through which the stream of water passes have no special or greater interest in said stream of water than the citizens of said borough generally;" and yet we have not been furnished with any of the evidence before him, from which he drew that conclusion. It can hardly be expected that we can reverse the decree on this ground in the dark. The other errors assigned all depend necessarily upon this first one. Had a map or plan been attached to the paper-book showing the course of the stream, it would have materially assisted us in arriving at a just and satisfactory decision.

From the master's report, however, it may be inferred that John Allison being the owner of the land upon which the borough of Greencastle is now built, laid it out in streets and lots, and, with a view to secure a supply of water to the grantees of the lots from him, purchased from William Rankin, who was the owner of a stream in the neighborhood, the right to draw therefrom a certain quantity for that purpose. On the 8th of March 1786, he took from him an obligation to that effect. A copy of this bond is not given in the paper-books. It would seem that an artificial watercourse must have been intended. The stream, with some alterations made many years ago in its channel at the request of

residents near its line to suit their convenience, still flows through the corporate limits, passing over streets and· alleys, lots and enclosures. It ran over the ground originally, but in 1857 in pursuance it would seem of the Act of Assembly of that year, to be presently adverted to, it was trunked and dipping boxes placed at different points on the line in the streets, for the convenience of the residents and their cattle. The expenses of the work were paid by the borough for that portion of the trunk which crossed streets and alleys, and by the lot-holders for the portion included within their limits. What title or interest the borough had to any part of this stream does not appear. From the terms of Rankin's grant as recited, he was to deliver the water to John Allison and his assignees for ever—which undoubtedly meant the grantees of lots from him. If it crossed streets and alleys laid out by him for public use, as is perhaps to be inferred, then undoubtedly the borough, rightfully invested with the care and oversight of the public highways, may· be considered as one of his assignees to whom the benefit of this grant extended. If then this is an artificial stream of water, each proprietor of land over which it passes, and the borough so far as the highway is concerned, has a right to the enjoyment of it in the course marked out for it, either by its original designation or by subsequent agreement, and is under the obligation to keep his portion of it in such a condition of repair that the usual amount shall be transmitted to the other proprietors below and in its usual state of purity. If he fails in this duty he is liable to an action by any or all of the proprietors below, including the borough, for damages : Washburn on Easements 293. Had the entire stream been granted or dedicated by John Allison to public use before making any grants, so that his grantees would have derived title, subject to such grant or dedication, then indeed a question like that so much debated in Hammett *v.* The City of Philadelphia might have arisen. But upon the meagre facts reported, the case seems to stand entirely clear of that question.

The Act of Assembly of April 8th 1857, Pamph. L. 329, authorized the borough authorities of Greencastle to take upon themselves the supervision of the water and watercourse in question, to see that the proper quantity of water is at all times delivered by the heirs or assignees of William Rankin, deceased, according to the terms of the contract between him and John Allison, and to enforce the delivery of the same by·such suit or suits in their corporate name as may be necessary. If the borough was in law or fact an assignee of John Allison this provision was unnecessary ; to the extent of the damage suffered by the streets it had such a right and such a remedy. But if it was intended to vest in the borough the right to recover all the damages suffered by all Allison's other assignees—grantees of lots—it surely

needs no argument to prove that it was entirely beyond legislative power. They could not take away the rights of the grantees derived under the contract between Rankin and Allison, nor could they assign their rights to the borough without their assent. But the act went further, and authorized the authorities, or a majority of them, "whenever they may deem the same necessary by themselves, their agents, engineers, officers and workmen, and with their tools, carts, wagons and horses, to enter upon any of the lands, lots, enclosures, streets, lanes, alleys or highways, along the original or present course of the said stream, for the purpose of examining the condition thereof, removing obstructions therefrom, repairing the bed or channel of the same, or preventing the wasting of the water therefrom or its appropriation to uses not designed originally." Be it remembered, that these provisions relate not to a public easement, but to a private watercourse, secured by grant and contract to private lotholders, and in which, if the borough had any pretence of right, it could only be as assignee and custodian of the streets over which it passed. The borough is invested not with the power to take the stream for public use upon making compensation to the owners, the only constitutional and legitimate mode of accomplishing the object, which may have been useful and laudable, but with all the powers incident to such taking with no provision for compensation. Nay, proceeding a step further, the act provides "that the expenses incurred in repairing the said watercourse and keeping the same in good order shall be paid as follows, to wit: those incurred in the streets, lanes and alleys of the said borough, shall be paid out of the borough funds, and those incurred on private property shall be taxed by the said burgess and town council against the property through which the said stream passes, according to the amount expended upon each property, and shall be a lien thereon, and collected as other borough taxes are by law collected." Now this power would have been well enough, if it had been preceded by the necessary preliminary step of taking and appropriating this private watercourse to public use, and if it had appeared that the private owners of property through which the stream flows were specially benefited by such repairs and improvements. The last section of the act is conceived in the same spirit, for it declares " that the burgess and town council aforesaid may by ordinance provide what fines and penalties shall be enforced against any person who shall wilfully or maliciously do any injury or damage to the said watercourse, or who shall obstruct the same, divert or use the water unlawfully, waste it or render it impure or unfit for use." It is very evident that the legislature must have been informed or believed that this watercourse had been dedicated by John Allison for the public use of the inhabitants of the borough. On this supposition only can such legislation be accounted for. All that we can

15 P. F. Smith—29

say is, that if such was the fact, it has not been made to appear to us by anything upon this record. This invasion of private rights and property seems to have been submitted to in 1857, but that is no reason why it should continue to be, or why this or any other court should countenance its enforcement.

Decree affirmed and appeal dismissed at the costs of the appellants.